Cite as 2020 Ark. App. 448

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV-19-728

| | |
|---|---|
| SURYA JANJAM | **Opinion Delivered** September 30, 2020 |
| APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04DR-17-1983] |
| V. | |
| GOSIKE RAJA RAJESHWARI | HONORABLE JOHN R. SCOTT, JUDGE |
| APPELLEE | AFFIRMED |

## MEREDITH B. SWITZER, Judge

Surya Janjam ("Surya") and Gosike Raja Rajeshwari ("Raja") were divorced on May 30, 2019, by order of the Benton County Circuit Court. On appeal, Surya contends the circuit court clearly erred in four respects: (1) granting Raja a divorce based on the ground of general indignities; (2) not granting joint custody of the parties' minor child; (3) awarding retroactive child support; and (4) awarding Raja an unequal division of marital property. We affirm on all points.

## I. *Facts*

The parties married on December 25, 2014, and have a son, EJ, who was born on August 13, 2016. The parties separated on December 15, 2017. Raja filed her complaint for divorce, alleging general indignities, on December 18, 2017.[1] EJ was undergoing

---

[1]In her original complaint, Raja alleged Surya had absconded with EJ out of the country (both parties are from India)and refused to bring EJ back into the country for extended periods of time or to notify Raja of his whereabouts. On the basis of Raja's

treatments for leukemia at that time. On December 27, the parties entered into an agreed temporary order giving Raja primary custody with Surya having visitation either supervised by Raja's parents or taking place at Raja's home. They agreed to travel to Little Rock together for EJ's leukemia treatments; for Surya to continue paying health-insurance premiums and any out-of-pocket medical expenses for EJ; and for Surya to pay $350 a month toward Raja's rent beginning in January 2018. The temporary order further provided that "the issue of child support is reserved for the final hearing. That this amount of child support is a deviation from the child support chart due to [Surya] paying 100% of all medical expenses because of the child's illness."

In February 2018, Raja moved to modify the temporary order asking for Surya's visitation take place in a public location because her parents were no longer in the United States and could not supervise visitation. Surya requested the temporary order be modified to joint custody of EJ because he was capable of caring for EJ without supervision.

A second temporary order, filed on May 22, kept temporary custody with Raja and modified Surya's visitation to alternating weekends. The parties were also ordered to list the marital home for sale. This order further provided, "[Surya] shall continue paying support of $350.00 per month as well as the medical expenses for the child per the initial Temporary Order pending a final hearing in this matter."

divorce petition, the circuit court entered an ex parte order on December 19 vesting temporary custody in Raja and granting Surya reasonable supervised visitation. Raja later amended her complaint to clarify that while EJ was in Raja's parents' custody in India, Surya's parents had taken him and refused to return EJ to either Raja or her parents.

On May 24, Raja filed a motion requesting an increase in spousal support because she lost her job due to her immigration status because Surya refused to turn over the necessary papers for her to renew her visa. Surya objected, but the circuit court ordered Surya to pay Raja $650 for the month of August.

The testimony at the final hearing revealed the following: Raja moved from India to Houston after she and Surya married. They then moved to Bentonville in August 2015 for Surya to work at Walmart. She was concerned Surya was having an affair with an ex-girlfriend because he regularly locked himself in the bathroom or bedroom and called her. She also found what she described as "vulgar" photos of the ex-girlfriend on Surya's cell phone; when she confronted Surya, he accused her of violating his privacy.

Raja also testified that the couple had financial disputes. She said that Surya held a second job, but she performed all the duties for that job; she responded to emails for him, logged into meetings as him, and reported the meeting details back to him. When she became pregnant and was unable to keep up with the work, Surya lost the second job and blamed her for the loss of income. According to Raja, Surya pressured her to obtain employment; she began working for Walmart in March 2016 and worked until one week before she delivered EJ.

Surya handled all the finances, including Raja's income. When she asked about his income, he told her she did not need to know how much money he made and needed to worry only about how much money she made. He required her to be transparent about her finances, but he did not have to reciprocate, and Raja was not to question him. When Surya learned that Raja had changed her bank-account password, Surya became angry and

3

told Raja, who was pregnant at the time, that she had to buy her own groceries, make her own meals, sleep by herself, and pay her own living expenses. She was told that if she wanted to live with him, she had to give him her money. She also recalled a time during her pregnancy when Surya was going out of town, refused to leave the house keys with her, and told her she had to stay out of the house. It was only when she threatened to call the police that Surya relented and left the keys behind.

According the Raja, Surya began pressuring her to return to work two months after EJ was born. When she told Surya that she would stay home with EJ, he told her that she would have to go back to India with EJ because it was too difficult for him to take care of them both. Raja returned to India with EJ and lived with her parents for six months. During that time, Raja's parents supported her and EJ; Surya gave her no money. Surya took Raja and EJ to India and left them at her parents' home. He claimed he was going on a business trip, but when he returned, Raja detected a change in his behavior, and she discovered photos and social-media posts about Surya's being with his girlfriend.

Raja returned to the United States in July 2017 and began working for Walmart. EJ remained in India with her parents until October 2017, when her father brought EJ back to the United States and stayed to care for him until February 2018. Her father returned to Arkansas again from October to December 2018 to assist Raja with EJ. Raja testified that to her knowledge, Surya had never sent any money to her father to assist in EJ's care. He did, however, send about $40,000 to his family during that same time frame and did not tell her he was sending the money.

Raja recounted that her paycheck was deposited into a joint account, but Surya's paycheck was not always deposited into the joint account; she later learned he was depositing sums from his paycheck into an account solely in his name. She said that $51,000 was transferred from her account to Surya's account, but Surya never transferred any money from his account to her account.

Raja also testified that in September 2017, she told Surya she would call the police if he tried to separate her from EJ, and he locked her cell phone in the bedroom. When she told him that she knew about his affair and only stayed with him for EJ, Surya hit her in the face, choked her, and kicked her off the bed. When she decided to file for divorce, Surya refused to timely provide her with her work visa, passport, and documentation needed to renew her visa; as a result, she lost her job.

EJ was diagnosed with leukemia in November 2017; he was currently in a maintenance phase, requiring weekly labs and monthly treatments; and while she usually took him for those appointments, Surya took him if she had to work. She testified she paid approximately $800 a month for daycare, but EJ had not been going recently due to his illness. Raja stated EJ was sometimes sick when he returned from visitation. She explained that she did not take EJ to crowded places or out in bad weather due to his leukemia and tried to keep him on a schedule. She had asked Surya to take the same precautions, but when she tried to address her concerns with Surya, he told her that he was taking care of EJ. Raja did not believe Surya prioritized EJ's health during visitation, and he did not give EJ the proper doses of medication during visitation. When she saw Surya out without EJ during his visitation and inquired where EJ was, Surya told her not to ask him "stupid"

5

questions. Raja acknowledged that she and Surya had spent more time together with EJ since February 2019, and he was happy with both of them; they attempted a reconciliation because, according to Raja, she thought it would be good for EJ to have his father around, but the attempt was unsuccessful because the same problems were present. Raja testified Surya made her condition in life intolerable because he did not value her, instead choosing his parents and brother over her; he would keep secrets from her; he controlled all of the finances and refused to share that information with her; and he told her that if she did not contribute financially to the family, she was no longer his wife and needed to leave.

When asked about Surya's separate bank account and its balance at the time of separation, Raja first testified that there was $60,000 in Surya's separate bank account at the time of the separation, but she later testified that the amount was around $50,000. Raja admitted that she also had a personal bank account and had made some purchases using that account, including plane tickets for her parents, but she said that she always had to answer to Surya about how she spent her money. She said that at the time of separation, she had about $9000 in her account. When she separated from Surya, she took about $2300 of the $3000 remaining in the joint account, but she said Surya had previously taken $12,000 out of the joint account.

Raja asked the circuit court to order retroactive child support. Surya's attorney objected stating the December 27, 2017 agreed temporary order addressed child support and required Surya to pay all of EJ's medical bills. Raja's counsel argued that the evidence indicated that the medical bills were covered almost entirely by insurance, so Surya was not paying nearly the amount of medical bills he led Raja to believe. The circuit court initially

6

declined to admit any evidence regarding back child support but later reversed that decision stating the initial temporary order had specifically reserved the issue of child support.

Nagabhooshanan Rajeshwari, Raja's father, testified he had visited Surya and Raja three times during their marriage. During his first visit, he witnessed how Raja and Surya interacted with each other. He expressed concern about how Surya treated Raja, noting he had to intervene twice when Surya tried to "manhandle" Raja. He said Surya avoided Raja, and the only way the two communicated was in anger. Raja's father said he never saw Surya help with EJ, and Surya had asked him on at least fifty occasions to take Raja and EJ back to India with him. He said that when he had supervised Surya's visitation, Surya did not know how to feed EJ or to give him medication. It was his opinion that EJ should remain in Raja's custody.

During Raja's case-in-chief, Surya testified he had received a $3000 tax refund for 2017 but gave Raja none of that money; he had a savings account and claimed the balance at separation was about $10,000; and on December 8, 2017, his checking account had a balance of $19,574, on January 10, 2018, the balance was $51,364, and as of the date of the hearing, the balance was $30,000. Surya asserted that he had $18,348 in his checking account when they married, and at the time of separation, there was "a little bit more" than $50,000 combined in his checking and savings accounts. He said his 401(k) was valued at $87,000, but $22,000 was premarital. Surya said his take-home pay was about $2700 biweekly.

Surya denied that he controlled Raja's finances, pointing to the fact that they both had their own personal checking accounts. He noted that he had opened a joint checking

7

account at Raja's request after he had asked her to share the financial responsibilities, but he claimed that only $4000 of the $20,000 in total household bills from August to December 2017 was paid from the joint account; the remainder was paid by him. Surya claimed that Raja contributed only $3840 to household expenses during the marriage.

Surya testified he paid for EJ's medical insurance through his employer and with Tax Equity and Fiscal Responsibility Act (TEFRA) Medicaid coverage, which costs approximately $500 a month. While there was initially approximately $14,000 in medical bills, Surya admitted those bills had been paid in full by TEFRA back to the initial diagnosis, and he had only had to pay for some medication. Surya denied he had not spent money on EJ's behalf, noting he had purchased clothes and toys and had paid $350 in monthly child support. He claimed to have spent between $14,000 and $16,000 for EJ's support since the separation. Surya asked for full custody of EJ but wanted joint custody if that request was not granted, stating he believed he and Raja could communicate well enough to share custody.

Surya admitted that since the separation, he had returned to India and filed a court action to require Raja to return home and resume her marital relationship. He explained that the Hindu marriage act allowed for the restoration of conjugal rights. He estimated that he sent approximately $35,000 to his parents in India during the marriage, and $20,000 to $25,000 during the separation. He explained that his father is retired, his sister was not married, his parents were actively seeking a husband for his sister, and marriages cost a lot of money in India. He claimed that he consulted Raja when he sent money to his parents. He also admitted that he gave his brother $3000 when his niece was born.

Surya claimed Raja had always been knowledgeable about their various financial accounts, but he admitted he had not told Raja about a $20,000 after-tax bonus he received in 2018 because they were separated by then and no longer discussed finances. He denied transferring money from Raja's account to his account and claimed Raja was the one who made the transfers. He said that when he and Raja were living together, his income was $2,425.05 biweekly, and he was currently making $2900 biweekly.

In his case-in-chief, Surya denied that he made Raja's life intolerable, controlled all the finances, forced Raja to return to work, or locked her out of the house while she was pregnant. He stated that he had sent about $30,000 to his family in India during the separation but had also been paying $350 in monthly child support to Raja during that time.

In closing arguments, the attorney ad litem stated that on the basis of her review of many documents in the case, home visits, and conferences with the parents, she believed that Raja has been EJ's primary caregiver during the marriage and especially after the separation. While acknowledging that both parents had been very active in EJ's leukemia treatments, she opined that Surya had shown a disregard for EJ's welfare by not providing enough money to properly care for his needs considering he was paying temporary support below chart amount only because he was required to pay the medical bills, but in actuality the medical bills had been paid nearly in full by insurance. The attorney ad litem acknowledged that Surya cared for EJ well when he had EJ but because he was giving Raja only limited support each month, she believed the financial constraint was forcing Raja to return to him, and that was not in EJ's best interest. The attorney ad litem recommended that EJ's custody remain with Raja subject to Surya's visitation.

9

A divorce decree was entered on May 30, 2019. Raja was granted a divorce on the ground of general indignities and was awarded primary custody of EJ with Surya receiving standard visitation. Surya was ordered to pay $495.80 biweekly in child support, which was based on his current biweekly income of $3312 as well as 15 percent of any future bonuses, less deductions for taxes. Additionally, the circuit court found Raja was entitled to receive child support from the date of separation through the final hearing and ordered Surya to pay back child support in the amount of $9565.60. The circuit court arrived at this figure by multiplying the $405.80 biweekly amount of support by thirty-two biweekly periods (December 2017 through May 2019). This calculation equaled $15,865.60 for that period of time, and Surya was given credit for the eighteen monthly payments of $350, or $6300, leaving a balance of back child support of $9565.60. Surya was ordered to maintain health insurance and TEFRA Medicaid coverage for EJ as well as pay for any and all out-of-pocket medical expenses not covered by EJ's health insurance. The circuit court further ordered division of certain marital property. Surya filed a timely notice of appeal.

## II. *Standard of Review*

Our court reviews domestic-relations cases de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Doss v. Doss*, 2018 Ark. App. 487, 561 S.W.3d 348. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* Due deference is given to the circuit court's superior position to determine the credibility of witnesses and the weight to be given their testimony. *Id.*

10

### III. *Grounds for Divorce—General Indignities*

Surya first argues the circuit court erred in granting Raja a divorce on the ground of general indignities. Divorce is a statutory creation and may be granted only upon proof of a ground listed in the statute. *Lundy v. Lundy*, 2014 Ark. App. 573, 445 S.W.3d 518. One ground for dissolving the bonds of matrimony is when either party "shall offer such indignities to the person of the other as shall render his or her condition intolerable." Ark. Code Ann. § 9-12-301(b)(3)(C) (Repl. 2015). To obtain a divorce on the basis of general indignities, a plaintiff "must show a habitual, continuous, permanent, and plain manifestation of settled hate, alienation, and estrangement on the part of one spouse, sufficient to render the condition of the other intolerable." *Lundy*, 2014 Ark. App. 573, at 2, 445 S.W.3d at 520. Theses manifestations may consist of rudeness, unmerited reproach, contempt, studied neglect, and open insult; however, mere uncongeniality and quarrelsomeness, without more, are insufficient to sustain an accusation of general indignities. *Id*. In contested divorce cases, the grounds for divorce must be corroborated unless specifically waived in writing, but the evidence of corroboration need only be slight, and it is unnecessary to corroborate every element or essential fact of the complaining spouse's testimony. *Coker v. Coker*, 2012 Ark. 383, 423 S.W.3d 599.

The circuit court specifically found Surya had offered such indignities toward Raja so as to "render her condition intolerable, including but not limited to, [Surya's] having private phone conversations with his girlfriend within the bounds of matrimony, exercising financial control over [Raja] and perpetuating financial deceit as to the disbursement of funds, and exhibiting a total disdain for [Raja]." Surya claims there was no testimony as to

11

how his alleged conversations with his ex-girlfriend cause Raja's life to become intolerable, and there was insufficient evidence to find that he exercised financial control over Raja or had deceived her regarding the disbursement of marital funds. He further asserts that he asked Raja who she was to question him, and this one-time statement, while it might be quarrelsome, did not rise to the level of settled hate, alienation, and estrangement.

We disagree with Surya's contentions on this point. Raja's testimony was that Surya locked himself in a room to talk to his ex-girlfriend on numerous occasions. Raja found pictures of the ex-girlfriend on Surya's cell phone as well as pictures and statements of him and his girlfriend traveling in India when he was allegedly on a "business trip" and had left Raja and EJ at Raja's parents' home to go on said trip. Regarding his financial control, Raja's and Surya's testimony was diametrically opposed.

While these were the only examples specifically listed in the divorce decree, the circuit court did not limit its decision to those examples. Raja testified that when she changed her bank-account password, Surya refused to support her, telling her that she had to pay all of her living expenses, even though she was pregnant. He also threatened to lock her out of the house while he went out of town, relenting only when she threatened to call the police if he did so. Raja also testified about physical abuse and the fact Surya told her to return to India with EJ if she would not work because he could not support them.

Raja's father corroborated Raja's testimony, noting Surya would not speak to Raja except to yell at her and argue with her, he would avoid her, and on two occasions, he had to intervene to keep Surya from "manhandling" Raja. Surya asks this court to reweigh the evidence in his favor, and we will not do so. It is within the circuit court's discretion to

12

determine the credibility of witnesses and the weight to be given their testimony, and the appellate courts give due deference to those determinations. *Doss*, *supra*. There was ample evidence presented and corroborated by Raja's father to support an award of divorce based on general indignities. We find no clear error.

IV. *Custody*

Surya next argues the circuit court erred in not awarding joint custody of EJ. Child-custody matters are reviewed de novo on appeal, but the circuit court's findings are not reversed unless they are clearly erroneous. *Cunningham v. Cunningham*, 2019 Ark. App. 416, 588 S.W.3d 38. Whether a circuit court's findings are clearly erroneous turns in large part on the credibility of the witnesses, and special deference is given to the circuit court's superior position to evaluate the witnesses, their testimony, and the child's best interest. *Id*. There are no cases in which the circuit court's superior position, ability, and opportunity to observe the parties carry as great a weight as those involving minor children. *Id*.

The primary consideration in child-custody cases is the welfare and best interest of the child, with all other considerations being secondary. *Id*. Although our legislature has amended Arkansas Code Annotated section 9-13-101 to state that an award of joint custody is favored in Arkansas, joint custody is not mandatory. *Wilhelm v. Wilhelm*, 2018 Ark. App. 47, 539 S.W.3d 619. The statutory preference for joint custody does not override the ultimate guiding principle that the best interest of the child is the polestar factor for a custody determination. *Carrillo v. Morales Ibarra*, 2019 Ark. App. 189, 575 S.W.3d 151.

Surya argues that the testimony established that the parties were able to cooperate and make decisions together for EJ. He points to the fact that both he and Raja had shared

in medical childcare responsibilities after EJ was diagnosed with leukemia; the parties have both been active in EJ's treatments and in providing childcare while he has been unable to attend day care. Surya had also been exercising visitation in the months prior to the final divorce decree.

However, before the parties' separation, either Raja or her father had primarily cared for EJ with very little assistance from Surya, who told Raja that EJ was her responsibility. When Raja wanted to stay home after EJ was born, Surya told Raja to return to India with EJ because it was too difficult for him to support them both. Raja did take EJ to India and remained there for six months with her parents. When she returned to the United States to work, EJ remained with her parents for approximately another four months until her father returned to the United States with him. Raja's father testified that while he was visiting, Surya asked him on about fifty occasions to take Raja and EJ back to India with him.

Raja expressed concerns about Surya's not taking precautions with EJ due to his health issues and not keeping him on a schedule. Raja testified EJ would return from visitation sick, but Surya claimed to not know why.

The attorney ad litem recommended from her observations and investigations that primary custody remain with Raja, noting Raja was EJ's primary caregiver both before the separation and especially after the parties separated. She opined Surya showed a disregard for EJ's welfare by not providing sufficient financial support, and she was concerned this was a ploy by Surya to force Raja to come back to him.

14

Even though the parties seemed to have periods of time in which they were able to get along, there were factors indicating joint custody was not in EJ's best interest. Surya had little interaction with EJ while the parties lived together. Surya told Raja that EJ was her responsibility, and if she would not work, she needed to move back to India with EJ, which she did. According to Raja's father, Surya asked him on numerous occasions to take Raja and EJ back to India with him. Furthermore, according the Raja, Surya had a history of returning EJ to her sick and exhausted after visitation. The attorney ad litem noted Raja was EJ's primary caregiver, and she was concerned that Surya was not providing sufficient support for EJ, perhaps in an effort to force Raja to return to the marriage. EJ is not a pawn to be used to coerce a desired outcome. Given the fact that credibility determinations are the responsibility of the circuit court, and this court does not reweigh evidence and the credibility assigned to it, we cannot say the circuit court's decision that it was in EJ's best interest to grant custody to Raja was clearly erroneous.

## V.  *Retroactive Child Support*

Surya, citing *Hawkins v. Hawkins*, 2013 Ark. App. 330, asserts that the circuit court erred in awarding retroactive child support, arguing that retroactive child support may not be awarded absent a proper motion to modify. We hold that this case is more akin to *Rudder v. Hurst*, 2009 Ark. App. 577, 337 S.W.3d 565. In *Rudder*, child support was set in a temporary order, but the issue of the correct amount of permanent child support was reserved for the final hearing. At the final hearing, the parties stipulated that the child-support obligation was a higher amount than had been set at the temporary hearing. The circuit court took the difference between the two amounts and multiplied it by the number

of months separating the two orders to arrive at the total amount of retroactive support due and granted judgment for that amount. This court held in *Rudder* that modification of a temporary support order was not prohibited where the circuit court reserved judgment until a later determination, and there was no error when the circuit court made any contemplated adjustments.

In the present case, Surya claims the parties never intended to reserve the issue of child support in the temporary order. The initial agreed temporary order provided that Surya was to pay $350 a month toward Raja's rent and would continue to pay EJ's health–insurance premiums and any out–of–pocket medical expenses for EJ; the temporary order further provided that "the issue of child support is reserved for the final hearing. That this amount of child support is a deviation from the child support chart due to [Surya's] paying 100% of all medical expenses because of the child's illness." A second temporary order modified Surya's visitation to alternating weekends and further provided, "[Surya] shall continue paying support of $350.00 per month as well as the medical expenses for the child per the initial Temporary Order pending a final hearing in this matter." In fact, Surya was not paying EJ's medical expenses in the amounts initially contemplated because insurance covered almost all the expenses. While Surya contends the parties never contemplated and reserved the issue of retroactive child support for the final hearing, this wording clearly indicates that the issue of child support was to be reserved and revisited at the final hearing. We cannot say the circuit court was clearly erroneous in awarding retroactive child support.

## VI. *Division of Marital Property*

For his last point on appeal, Surya contends that the circuit court erred in awarding Raja an unequal division of marital property. Specifically, he takes issue with the division of the bank account in his name and his 2017 bonus (paid in 2018).[2]

All marital property shall be distributed equally to each party unless the circuit court determines that such a division is inequitable. Ark. Code Ann. § 9-12-315(a)(1). Surya first argues Raja is not entitled to one-half of $54,000 from his bank account because the balance of that account at the time of separation was $51,364, and it was his testimony that $18,348 of that was premarital. He contends Raja was entitled to only one-half of $33,016, or $16,508.

The parties' testimony on the valuation of the bank accounts was unclear and imprecise; no financial records were introduced. The circuit court was left to rely solely on the parties' conflicting testimony. While Surya testified that some of the funds in his bank account were premarital, the circuit court was not obliged to credit that testimony. There was also testimony Surya had given away large sums of money to his family without Raja's knowledge or consent. We cannot say the circuit court clearly erred in the division of Surya's bank account.

---

[2]The parties had previously agreed Surya would pay Raja $35,000 for her interest in the marital home. The circuit court ordered that each party was to retain the items of personal property in their possession, including vehicles. Raja was awarded one-half of Surya's 401(k), minus $22,000 that was premarital. Surya was awarded one-half of Raja's 401(k), and Surya was ordered to pay Raja one-half of his 2017 tax refund of $3000 and one-half of his 2018 bonus (paid in 2019), which was $11,200 after a 30 percent deduction for tax consequences. Surya raises no issue on appeal regarding the division of these assets.

Surya contends the circuit court did not consider the $11,300 Raja testified was in her account at the time of separation. He further asserts that although the circuit court reduced his 2018 bonus by 30 percent to account for tax consequences, the division of the remaining $20,000 resulted in an inequitable distribution in Raja's favor because the court failed to factor in the 12 percent contribution from that bonus to his 401(k). Surya made no objection to the circuit court about the distribution of these assets; these arguments are being raised for the first time on appeal. It is well settled that the appellate courts will not consider arguments made for the first time on appeal; an appellant is limited by the scope and nature of the objections and arguments presented at trial. *See Pilkinton v. Pilkinton*, 2018 Ark. App. 624, 569 S.W.3d 882. We affirm the circuit court's division of marital property.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Garrett Law Firm, PLLC*, by: *Earl J. Garrett*, for appellant.

*Tina Adcock-Thomas*, for appellee.