Cite as 2025 Ark. App. 538

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-24-576

|  |  |  |
|---|---|---|
| PRISCILA PODLESKI | | **Opinion Delivered** November 5, 2025 |
| | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04DR-23-152] |
| V. | | |
| JACOB PODLESKI | | HONORABLE DOUG SCHRANTZ, JUDGE |
| | | **AFFIRMED** |
| | APPELLEE | |

## WAYMOND M. BROWN, Judge

Appellant Priscila Podleski appeals from the decree of divorce entered by the Benton County Circuit Court on January 23, 2024.  In that order, the circuit court awarded Priscila and her now ex-husband, appellee Jacob Podleski, joint custody of their young son.  On appeal, Priscila argues that the circuit court erred in (1) finding that she failed to overcome the statutory presumption in favor of joint custody; and (2) excluding the testimony of the parties' marriage counselor, Dr. Diana Haberman.  We affirm.

The parties were married for nine years and share one child, MC.  Priscila filed a complaint for divorce on February 1, 2023.  A temporary custody hearing was held on March 15.  Priscila sought temporary primary custody, expressing safety concerns and claiming that Jacob, a practicing anesthesiologist, lacks the ability to care for MC on his own.  She alleged that Jacob has an alcohol

problem that makes him aggressive and "easily angry." She further alleged that Jacob physically attacked her on multiple occasions and verbally abused her regularly.

Priscila testified that in 2008, during an argument, Jacob "hit [her] so hard in the stomach it knocked the wind out of [her]." She stated that "there was always punching, hitting, shoving, pinching." In 2016, while in Cleveland for an anesthesiology conference, Jacob, in a drunken state, pinned her down on the bed and choked her to the point that she thought she was going to die. She claimed that in 2017, while in Mexico, Jacob punched her arm, leaving cuts and bruises.

Priscila admitted that Jacob had never been physically abusive to MC; however, she stated that there were occasions when Jacob consumed alcohol to such excess that he was unable to care for MC. She described an incident when Jacob was "stumbling drunk" while in the swimming pool with MC, resulting in MC's mouth being submerged in the water, which caused him to cough. Priscila also alleged that during a car ride, Jacob endangered MC's life by unbuckling his car seat while the vehicle was traveling on the highway. She additionally claimed there were other incidents during which Jacob failed to appropriately care for MC because he was "passed out" from drinking. Priscila requested to be MC's primary caregiver, with Jacob having supervised visitation and no overnights. Priscila testified that, since separating, she and Jacob have communicated effectively regarding MC and can continue to do so. Photographs of Priscila's alleged injuries were admitted into evidence along with photographs of Jacob allegedly passed out from drinking and documents signed by Jacob after the abuse incidents in which he agreed to "seek help for his anger."

On cross-examination, Priscila admitted that, despite her allegations of domestic abuse and Jacob's issue with alcohol, she left MC in Jacob's care for two days while she traveled for work. Furthermore, she acknowledged that she also drinks alcohol and had praised Jacob's parenting and

2

bond with MC via posts on social media. Priscila admitted that since the divorce complaint was filed, Jacob voluntarily took and passed twice weekly urinalysis tests and a hair-follicle test and was determined to be low risk on a substance-abuse assessment.

Jacob also testified at the temporary hearing. He denied having a drug or alcohol problem and stated that his urinalysis and hair-follicle tests were all negative, and the result of a substance-abuse assessment showed that he had no risk of substance abuse. Jacob requested joint custody of MC. On cross-examination, he denied passing out due to overconsumption of alcohol and testified that he had never consumed alcohol while acting as MC's sole caregiver. Jacob further denied Priscila's claims of physical abuse, aside from a 2017 incident during which he hit her arm, "but she also hit [him] and threw things at [him] multiple times."

At the conclusion of the temporary hearing, citing Jacob's negative drug and alcohol test results and evidence that Priscila voluntarily left MC in Jacob's care when she traveled for work, the circuit court ruled that the allegations of alcohol and drug abuse were not supported by the evidence. The circuit court found that Priscila failed to defeat the presumption in favor of joint custody and awarded the parties temporary joint custody of MC with an equal division of parenting time.

A two-day final divorce hearing was held on October 10 and January 2, 2024. Custody of MC was the predominant issue before the court. Kaitlyn Lamonte, the parties' former neighbor, testified first. She stated that Jacob was "extremely condescending" and demeaning toward Priscila in both public and private settings. Jacob talked down to Priscila and called her names, such as idiot and stupid; however, Priscila "brush[ed] it off" or changed the subject. Kaitlyn stated that other neighbors expressed that it was uncomfortable to be around the parties because of the way Jacob treated Priscila. She further said that Priscila was MC's primary caregiver, and she could not recall

3

a time when she witnessed Jacob actively parenting. On cross-examination, Kaitlyn stated that she did not think Jacob was incapable of parenting.

Brian Reed, a physician assistant at a local hospital, testified next. He stated that Jacob had called Priscila stupid or dumb on "every occasion" they were together socially. Brian described Jacob's tone toward Priscila as aggressive, berating, belittling, and assertive, yet Priscila never fought back. Brian acknowledged that he never witnessed Jacob threaten or physically abuse Priscila and did not see Jacob direct ill behavior toward MC.

Pablo Nunez, Priscila's older brother, testified. He stated that he has known Jacob approximately seventeen years—since the parties began dating in high school. He said that, since MC's birth, he visited the parties three to five times a year. Pablo stated that he heard Jacob call Priscila "idiot" and "fucking idiot." During the last family Thanksgiving gathering, he called her stupid. Pablo testified that before he left to return home, he found Priscila crying in the kitchen, and he confronted Jacob about how he treated his sister. Jacob admitted that he shoved and slapped Priscila in Mexico a few years prior.

Pablo also stated that he told Jacob he needed to work on his relationship with MC. Jacob blamed Priscila and claimed that she was keeping MC from him. Jacob told Pablo that Priscila "has a tumor in the head," she is "screwed up," and he refused counseling because Priscila needed therapy, not him. He claimed that Priscila is at fault for how he speaks to her. Pablo testified that he never witnessed Jacob threaten or hit Priscila or MC, but he believes that Jacob is incapable of parenting MC because he is violent and aggressive.

Phillip Nunez, another of Priscila's brothers, also testified. He recounted an incident that occurred when he was visiting the parties' home. He stated that Jacob was upstairs with MC when

he heard MC begin screaming, "Papa, no. Papa, no." Phillip and Priscila went upstairs and saw Jacob "sprawled out on the floor" at the top of the stairs, holding onto MC's left leg, preventing him from moving. Jacob called Priscila a "fucking bitch" and "autistic" as she picked MC up and took him downstairs. Phillip stated that "stupid" and "autistic" are the names that Jacob most often called Priscila. He testified that Priscila never tried to defend herself.

Priscila was next to testify. She stated that she and Jacob were high school sweethearts. She claimed that Jacob first hit her in 2008, and the name-calling began in 2009, both well before the parties married in 2014. She described a 2009 incident during which Jacob punched the side of her head while she was driving and instances in 2015 while living in Cleveland when he choked, pushed, shoved, and kicked her.

Priscila testified that during a 2016 incident, she threw a lamp at Jacob when he was choking her. She stated that she was punching him to get him off of her, and once he let go, she grabbed a nearby lamp and threw it. Priscila said that her usual reaction to Jacob's attacks was to push him off. She also alleged other domestic-violence incidents, including a 2015 instance in Saint Kitts, during a New Year's Eve celebration that same year, and a 2016 episode that occurred when she asked for his help to book a flight. She stated that Jacob "has no restraint" with words when he is sober and even less so when he is drunk.

Priscila's continued to testify about documents she prepared and had Jacob sign. In June 2016, in response to Jacob's hitting her in the head, she typed an agreement defining abuse and requiring Jacob to attend anger-management and/or domestic-abuse therapy if he physically abused her again. Priscila testified that she and Jacob got into an argument in 2017; she threw a peanut butter jar at him when "he started coming at [her]." She described Jacob getting drunk at a friend's

5

wedding and urinating on the nightstand, telephone, and desk in a hotel room. Then in Mexico in July 2017 during an argument, Jacob punched Priscila's arm, resulting in bruises. In response, Jacob signed another agreement promising to go to professional therapy in September "to fix our marriage problems." Numerous similar incidents involving alcohol and abuse were described by Priscila. Notwithstanding her claims, she admitted that she never contacted the authorities. Priscila filed for divorce following Jacob's proclamation during a therapy session that alcohol was more important to him than Priscila.

Priscila testified that communication about MC and custody exchanges had gotten better, and they are able to "act like adults." Both parties have been permitted to FaceTime MC every night at bedtime. MC has a full-time nanny; the parties reached a mutual decision to hire the nanny to be shared between the homes. Priscila stated that she supports MC having a relationship with Jacob.

On cross-examination, Priscila admitted she has hit, punched, and thrown items at Jacob. She further acknowledged drinking around MC and calling Jacob names and saying regretful things while intoxicated. Priscila confirmed that since the divorce process began, there had been no violence or name-calling between the parties and that they communicate on a level necessary for coparenting. She conceded that Jacob's alcohol assessment and urinalysis tests indicated that he does not have an alcohol-abuse issue.

Priscilla agreed that MC is a happy, healthy child. Communication with Jacob has been civil and respectful. She stated that Jacob is a good dad and a bad husband. She testified that Jacob is patient with MC, is teaching him to be bilingual, sets a good example for working hard and accomplishing dreams, and is supportive of MC's needs.

6

Jacob testified that custody exchanges had been normal, and he believes Priscila wants what is best for MC. He agreed that he and Priscila called each other names and were physically aggressive toward one another throughout their relationship. Jacob stated that Priscila had thrown things at him, including a peanut butter jar, lamp, pillows, laptop, and other household items. He has been a practicing physician in northwest Arkansas since May 2020 and has never had alcohol-related issues, allegations, complaints, or investigations at work.

Dr. Diana Haberman, a licensed counselor, was next to testify. At the outset of her testimony, Jacob declared that "he is absolutely not waiving privilege" for the counseling sessions held jointly with Priscila. Priscila responded that statements made during the marriage-counseling sessions were made while seeking medical treatment and that "privilege was waived by the joint counseling sessions." The court ruled that Jacob had not waived privilege.

Dr. Haberman testified that on September 7, 2022, Priscila and Jacob came to her office together for couples counseling, although Priscila was the designated client.[1] She stated that she kept therapy notes of her counseling sessions. Priscila moved to introduce the notes into evidence; however, Jacob again objected on the basis of doctor-patient privilege. He argued that he attended sessions through February 2, 2023, and anything prior to that date was privileged information. Priscila agreed and proposed redaction of the medical records "to excise any reference to [Jacob]." Jacob responded that it would be impossible to make sense of the therapy notes with the proposed redaction. Priscila again agreed that it would "be difficult." The circuit court sustained the objection,

---

[1]Dr. Haberman indicated that, for licensing reasons, one party of a couple is identified as the designated client.

ruling that it would be difficult to separate the privileged portions of the notes from the notes pertaining only to Priscila. Dr. Haberman's therapy notes were proffered for the record.

Jacob, once again, raised the same objection to Dr. Haberman's testimony in conjunction with his joint sessions with Priscila. The circuit court again sustained the objection and permitted only testimony from sessions occurring after February 2, 2023, when Jacob stopped attending counseling.

Kevin Bonner, the attorney ad litem, stated that MC is a healthy, happy, stable child and that Jacob is a good dad. He stated that the parties were horrible spouses for each other but could be excellent parents. Bonner stated that the parties had been able to work together on decisions regarding MC and recommended that the court follow the preference for joint custody.

The circuit court ruled from the bench that no issues were raised during the final hearing indicating that the parties should not share joint custody. The court stated that the parties' communication regarding MC is "not too bad." The court noted that there were things that were not agreed on and questions sometimes went unanswered, but the communication "is not just terrible." In an order entered on January 23, 2024, the court awarded the parties joint custody of MC. Priscila appealed.

This court reviews matters of child custody de novo on appeal, but the circuit court's findings are not reversed unless they are clearly erroneous.[2] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and

_____

[2]*Janjam v. Rajeshwari*, 2020 Ark. App. 448, 611 S.W.3d 202.

8

firm conviction that a mistake has been committed.[3]  Whether a circuit court's findings are clearly

erroneous turns in large part on the credibility of the witnesses, and special deference is given to the

circuit court's superior position to evaluate the witnesses, their testimony, and the child's best

interest.[4]  There are no cases in which the circuit court's superior position, ability, and opportunity

to observe the parties carry as great a weight as those involving minor children.[5]

The primary consideration in child-custody cases is the welfare and best interest of the child,

with all other considerations being secondary.[6]  Although joint custody is favored in Arkansas,[7] it is

not mandatory.[8]  The statutory preference for joint custody does not override the ultimate guiding

principle that the best interest of the child is the polestar factor for custody determination.[9]

On appeal, Priscila first challenges the circuit court's award of joint custody.  She argues that

the circuit court clearly erred in awarding the parties joint custody given Jacob's pattern of domestic

abuse.

---

[3]*Id.*

[4]*Id.*

[5]*Id.*

[6]*Id.*

[7]*See* Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Supp. 2023).

[8]*Wilhelm v. Wilhelm*, 2018 Ark. App. 47, 539 S.W.3d 619.

[9]*Carrillo v. Morales Ibarra*, 2019 Ark. App. 189, 575 S.W.3d 151.

In an original child-custody determination in a divorce, there is a rebuttable presumption that joint custody is in the child's best interest.[10] An award of joint custody is rebutted if the court finds by clear and convincing evidence that joint custody is not in the child's best interest.[11] Another way to rebut the joint-custody presumption is found in Arkansas Code Annotated section 9-13-101(c)(1) and (2), which provides:

> (c)(1) If a party to an action concerning custody of or a right to visitation with a child has committed an act of domestic violence against the party making the allegation or a family or household member of either party and such allegations are proven by a preponderance of the evidence, the circuit court must consider the effect of such domestic violence upon the best interests of the child, whether or not the child was physically injured or personally witnessed the abuse, together with such facts and circumstances as the circuit court deems relevant in making a directive pursuant to this section.

> (2) There is a rebuttable presumption that it is not in the best interest of the child to be placed in the custody of an abusive parent in cases in which there is a finding by a preponderance of the evidence that the parent has engaged in a pattern of domestic abuse.

Priscila argues that the circuit court disregarded proof establishing Jacob's pattern of domestic abuse and ignored Arkansas Code Annotated section 9-13-101(c)(1)'s requirement that the court consider the effect of domestic violence on a child regardless of whether the child was physically injured or witnessed the abuse and the provisions of subdivision (c)(2)—the rebuttable presumption against joint custody if a pattern of domestic abuse is found. She contends there was ample testimony from neighbors, friends, and family as to the "abhorrent" manner in which Jacob treated her, both in public and private. Priscila asserts that the evidence established a pattern of physical and emotional abuse by Jacob all the way "up until the day the parties separated." Priscila argues that, as a result,

---

[10]Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)*.

[11]Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(b)(1)*.

the circuit court erred in failing to find a pattern of domestic abuse sufficient to rebut the presumption in favor of joint custody.

Priscila's argument for primary custody is based entirely on her allegations that Jacob engaged in a pattern of domestic abuse that serves to rebut the joint-custody presumption. Notably, the circuit court's order did not make a specific finding of a "pattern of domestic abuse" but did find that Priscila failed to overcome the statutory presumption of joint custody.

There was testimony that both parties engaged in acts of violence and name-calling during the marriage. Accordingly, in the divorce decree, the circuit court found that the parties dislike each other intensely, are bad spouses to one another, and rude and negative comments were made by both parties to each other as well as acts of physical aggression against each other: "No party [was] found to be better, or worse, than the other as it relates to such conduct between them." The court further found that MC is a good child who loves both parents, the parties communicated well regarding MC's care, and are able to provide him great opportunities and "the best of everything" if they continued to work together. Clearly, the circuit court, following the mandates of Arkansas Code Annotated section 9-13-101(c)(1), considered the effects of the domestic violence on the best interest of MC. On appeal, aside from the allegations of domestic abuse, Priscila failed to argue that joint custody was not in MC's best interest.

Priscila also challenges the circuit court's decision to exclude Dr. Haberman's therapy notes and testimony during the final hearing. Priscila argues that she was Dr. Haberman's designated patient and could release her treatment records, "which contained information provided by [Jacob]."

Our standard of review for evidentiary rulings dictates that circuit courts have broad discretion and that a circuit court's ruling on the admissibility of evidence will not be reversed absent

11

an abuse of that discretion.[12]  An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the court act improvidently, thoughtlessly, or without due consideration.[13]  We also note that an evidentiary error is harmless if the same or similar evidence is otherwise introduced at the trial.[14]

Specifically, as to the exclusion of Dr. Haberman's records and treatment notes, the issue is not preserved for appeal.  Before the circuit court, Priscila conceded that the doctor-patient privilege applied and offered to redact the privileged parts of the records.  She further conceded that redaction to exclude the privileged portions of the notes would be difficult without affecting the substance of the notes.

Relating to the circuit court's exclusion of Dr. Haberman's testimony about the joint therapy sessions with Jacob, Priscila fails to craft a convincing argument why the doctor-patient privilege should not apply or how the circuit court erred in the ruling.  We will not consider arguments not supported by convincing argument or citation to authority.[15]  Nor will we make an appellant's argument for her or consider an argument that is not properly developed.[16]  The most that can be gleaned from Priscila's vague argument on this point is that Jacob claims he is not an abuser; however, photographs and "his own written statements prove that his assertion is not true."  At the hearing,

---

[12]*Green v. Alpharma, Inc.*, 373 Ark. 378, 284 S.W.3d 29 (2008).

[13]*Ford Motor Co. v. Washington*, 2013 Ark. 510, 431 S.W.3d 210.

[14]*Eft v. Rogers*, 2012 Ark. App. 632, 425 S.W.3d 1.

[15]*Sanders v. JLP, LLC*, 2024 Ark. App. 65, 683 S.W.3d 607.

[16]*Id.*

Priscila, as well as multiple other witnesses, testified to Jacob's treatment of Priscila. As stated above, an evidentiary error is harmless if the same or similar evidence is otherwise introduced at the trial.[17] Therefore, for multiple reasons, this point provides no grounds for reversal.

Affirmed.

KLAPPENBACH, C.J., and HARRISON, J., agree.

*Rhoads & Armstrong, PLLC*, by: *Johnnie Emberton Rhoads*, for appellant.

*Tim Cullen*, for appellee.

---

[17]*Eft*, 2012 Ark. App. 632, 425 S.W.3d 1.