Cite as 2023 Ark. App. 398

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-21-618

| | | |
|---|---|---|
| BRYAN GADBERRY | | Opinion Delivered September 20, 2023 |
| | APPELLANT | |
| | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIFTEENTH DIVISION [NO. 60DR-18-2946] |
| V. | | |
| AUTUMN GADBERRY | | |
| | APPELLEE | HONORABLE AMY DUNN JOHNSON, JUDGE |
| | | AFFIRMED IN PART; DISMISSED WITHOUT PREJUDICE IN PART |

**WAYMOND M. BROWN, Judge**

Appellant Bryan Gadberry appeals the divorce decree entered by the Pulaski County Circuit Court and the subsequent order denying his motion for a new trial. He argues that we should reverse and remand the divorce decree because the circuit court erred by (1) denying appellant's motion for a continuance; (2) prejudicing the case when it entered its opinion before appellant presented his case-in-chief; (3) striking appellant's ability to present witnesses or evidence; (4) ordering retroactive child support without a previous order to pay child support; (5) imputing income, in view of appellant's inability to work; (6) denying joint custody; (7) requiring supervised visitation; and (8) awarding attorney's fees without allowing appellant to examine and question the time records. Appellant also contends that we should reverse and remand the court's denial of his motion for a new trial. We affirm in part and dismiss without prejudice in part.

The parties were married on September 13, 2006, and three children were born of the marriage, MC1, MC2, and MC3.[1]  Appellee Autumn Gadberry filed a complaint for divorce and emergency ex parte custody on August 10, 2018.  In the complaint, appellee indicated that the parties had separated that day, and she was seeking a divorce based on general indignities. She stated that appellant "has severe anger issues which he takes out on [appellee] and the minor children by yelling and screaming at [appellee] and the minor children," that appellant had threatened physical harm to appellee's family, and that she and the children were in clear and present danger due to appellant's "uncontrollable, disorderly and abusive conduct."   She also said that the children had recently entered counseling "for the emotional abuse they have received as a result of [appellant's] actions."  According to appellee, all three children suffered from "increased anxiety issues not common among children of their ages."  Appellee asked that she be granted custody of the children, temporary possession of the marital home, and proper orders regarding child support.  She also asked that appellant be restrained from being where she and the children may be and that the court suspend visitation between appellant and the children until such time as the visitation could be supervised.  The circuit court entered an order on August 13 granting emergency ex parte relief to appellee in the form of legal and physical custody of the children, temporary possession of the marital home, and restraining appellant and his agents from going to places where appellee and the children might reasonably be expected to be, except where appellant's presence is approved and supervised by appellee.  The parties entered into an agreed order on August 23 in which appellant's visitation with the

_____

[1]MC1, male, born in July 2008; MC2, female, born in May 2010; and MC3, female, born in November 2013.

children was set out, conditioned on his attending therapy with them. The order also stated that appellant was to complete at least six months of therapy, and all communications with appellee should be limited to the children and their well-being. Appellant filed an answer on September 7 denying the material allegations of appellee's complaint for divorce and asking the court to deny and dismiss it.

Appellee filed a verified ex parte petition to suspend visitation and for contempt on October 18. Appellee alleged that appellant's behavior had become increasingly bizarre and unpredictable and that he exercises irresponsible and reckless behavior, including (1) sending numerous and graphic text messages to appellee at all times of the day and night; (2) taking their "young daughter" to church without shoes; (3) leaving the children unattended at a Tropical Smoothie; (4) screaming at the children loud enough on two separate occasions in Dillard's that security had to be called; (5) leaving the children in IHOP unattended for almost three hours; (6) dropping MC2 off at school without socks, although socks are apart of the uniform and it was cold; and (7) keeping the children out late at night when they are in appellant's care. The circuit court entered an order suspending appellant's visitation with the children. The order also prevented appellant or any of his agents from being within five hundred feet of appellee and the children or where they may reasonably be. An emergency hearing took place on October 26; however, appellant was not present. The circuit court continued the suspension of appellant's visitation and kept in place the restraining order. Appellant filed a motion for continuance on October 30, stating that his potential attorney had a scheduling conflict with the November 5 hearing date. The circuit court granted the continuance in an order filed on November 1. It kept all prior orders in place. Another emergency hearing took place on

3

December 10. The circuit court kept the previous orders in place and urged the parties' attorneys to get together to try to work out something for child support. The circuit court also recommended that the parties get together and agree on visitation between appellant and the children supervised by a qualified therapist.

Appellee filed another ex parte petition to suspend visitation and for contempt on December 14, alleging that (1) appellant recorded her at the December 10 hearing; (2) appellant contacted the therapist before the December 10 hearing and told her not to say anything bad about him; (3) appellant contacts the place where the children are in counseling up to fifteen times a day and has been instructed not to contact the clinic, he leaves long voicemails on the mailbox when his calls are unanswered, and on December 10, he left an eighteen-page statement at the facility to "explain his side of things"; (4) on December 11, appellant was seen within five hundred feet of where the children were attending counseling and was two pews behind MC1 and MC2 during church services when appellee took MC3 to the bathroom. The order from the emergency hearing was filed on December 14 and provided that appellant was allowed supervised visitation with the children with a qualified therapist. It also required appellant to remain in therapy for six months as a condition of the visitation.

Appellant filed a pro se motion with the court on February 14, 2019, asking for modification of his supervised visitation. He also included pages of email correspondence between him and appellee's counsel and background and biblical information so that the circuit court could "get to know [him]." He filed an amendment on February 21. Appellee filed a response on February 22, asking the court to deny appellant's request. Another amendment was filed by appellant on February 25. The circuit court entered an order continuing the

4

emergency orders and keeping visitation suspended except for supervised visitation at Chenal Family Therapy with a qualified therapist.

Appellee filed a motion to compel discovery responses on May 17, contending that appellant had failed to completely or fully respond to the interrogatories and requests for production sent to him on October 2, 2018. Appellee stated that appellant provided responses on November 13, but they were "woefully insufficient" in that he completely failed to respond to twenty-five interrogatories and seventeen requests for production. She also contended that appellant failed to adequately respond to seven interrogatories and one request for production. Included in the motion was a March 29, 2019, email to appellant sent under Arkansas Rule of Civil Procedure 37 as a good-faith effort to resolve any potential dispute of the matter. Appellant filed a response to the motion on May 29, asking that the motion be dismissed. The circuit court entered an order on appellee's motion on November 19, directing appellant to fully and completely respond to appellee's discovery request within twenty-one days.

Appellant's counsel filed a motion to withdraw on July 3, citing a breakdown of the attorney-client relationship. On August 5, appellant filed a motion to withdraw his attorney and a motion for continuance, asking to have the scheduled August 7 hearing moved to allow him time to find a new attorney. He filed a second motion for continuance on August 6 as well as a "perfect and truthful explanation to shed light for the Honorable Judge Moore." An order continuing the emergency orders was filed on August 6, and the emergency hearing was continued to a date decided by the attorneys of record. The circuit court entered an order on August 9, relieving appellant's counsel of record.

A hearing was set for July 21, 2020. Appellee filed a second motion for an order to compel discovery on May 26. She stated that appellant's substituted responses were emailed approximately two months past the deadline on January 28. According to the motion, the responses were insufficient in that the answers were left unverified and incomplete and, in some cases, unanswered at all. She also alleged that appellant did not execute and produce all authorization requests as ordered by the circuit court. Appellee sent several good-faith attempts to resolve any issues (February 10, 12, and 18; and on May 18 asked for responses by May 21). No responses were received before May 21. Appellee asked the circuit court to order appellant to produce within ten days complete and verified responses without objections pursuant to Rule 37. The circuit court filed an order to compel on September 4, directing appellant to produce complete and verified responses to appellee's first set of interrogatories and requests for production without objections and including all authorizations no later than September 14. The circuit court warned appellant that it may "impose further sanctions against [appellant] in the future, including exclusion of exhibits and witnesses from any final hearing in this matter."

The hearing was rescheduled for January 14, 2021. Appellee filed a motion to exclude appellant's witnesses and exhibits on November 5, 2020, alleging that appellant produced supplemental responses on Octoer 23 that were insufficient, not completely responsive, and often not responsive to the question being asked. She also stated that appellant had failed and refused to properly identify witnesses listed in his discovery responses and failed to produce potential exhibits he intends to introduce, making it impossible for appellee to adequately prepare for the final hearing. Appellant filed a response on November 6, denying the material allegations of appellee's motion. He also stated that the amended scheduling order provided

6

that written discovery may proceed through December 4 and depositions may be conducted through December 30. He asked the circuit court to deny appellee's motion. Appellee replied on November 12.

Appellant filed a motion for continuance on December 23 asking that the hearing be "continued until such time as in person hearings resume" because he has "great misgivings about this matter being heard *via* Zoom." Appellee filed a response on December 23, asking the court to deny the continuance motion. Appellant filed his pretrial memorandum on January 7, 2021, along with his expected exhibits. He also named his parents as potential witnesses. The circuit court entered an order on January 8 denying appellant's motion for continuance. It noted that appellant had "previously requested, and been granted, two previous continuances in this matter." The circuit court opined that the children needed resolution. Appellee filed her pretrial memorandum on January 8.

At the beginning of the divorce hearing, appellant's counsel informed the circuit court that he had received notification from appellant in the early hours of the morning indicating that appellant had COVID-19 and was instructed not to participate in any activities for ten days. He stated that he emailed appellant and attempted to call appellant and his parents so that the doctor's note could be forwarded. Appellee's counsel indicated to the circuit court that she did not think a continuance should be granted because four continuances had already been granted in the case, two of which were at appellant's request. She stated that they had witnesses present and wished to proceed. The circuit court ruled that it was sympathetic with appellant but agreed that, due to the number of continuances already granted and appellant's lack of responsiveness to discovery requests, it was inclined to go forward with appellee's motion to exclude appellant's

7

witnesses and exhibits. However, it indicated that if appellant provided documentation, it would reset the matter for February 2. Appellee's counsel reiterated the arguments made in the motion, and appellant's counsel argued that the exclusion of witnesses and the exhibits was not the proper remedy for the discovery issues and that the relief sought was "too over expansive." Appellee's counsel contended that the relief sought was an appropriate sanction for the contempt appellant had shown before the court's orders. The circuit court agreed that the relief appellee sought was appropriate and granted it; however, it allowed appellant's affidavit of financial means to be admitted and stated that appellant would be able to testify on his own behalf if he made himself available to do so.

The circuit court went ahead with the hearing. Kenneth Clark, the CEO of Chenal Family Therapy, testified that the family was referred to the clinic for supervised visitations to be conducted by Kailah Tidwell. Clark stated that the visits did not take place because appellant failed to show up on February 12, 2019, for his six o'clock scheduled appointment and showed up late, banging on the door wanting to be let in after Tidwell left. He said that based on the report he received, appellant seemed disoriented, and he frightened a teenage girl waiting in the lobby. A coworker indicated that she was afraid for Tidwell's safety due to how appellant was banging on the door and her interaction with him. Tidwell subsequently decided not to provide supervised visitation services for appellant. Clark stated that appellant was notified of the termination of services the next day. He said that appellant emailed the facility around February 21 stating that it was not listed or specified in his court order and asking that no information about him be given to appellee or anyone else without his explicit written consent.

Anthony Boaz, the director of Strive, a school-based mental-health program through UAMS, testified that the children were seen by JoBeth Casados, who was on maternity leave at the time of the hearing. He stated that MC1 was diagnosed with anxiety disorder unspecified type as indicated on the July 30, 2018, clinic note. Boaz read to the circuit court clinic notes from MC1's sessions. In the August 14 clinic note, MC1 reported that he felt relief that his interactions with appellant would stop. He stated that he felt like his anxiety had gotten better since he was not around appellant. According to MC1, appellant would curse at him for no reason and strike him excessively (more than ten times) with objects such as belts and metal broom handles. He stated that he would sometime have bruises and indicated that he may have recordings or pictures of the abuse. Appellee was subsequently brought into the session and informed about MC1's abuse allegations and that a report would be made to the child-abuse hotline. In an August 23 telephone note, Casados indicated that she had to report alleged abuse because MC1 had informed her the day before that "his mother and father became involved in a physical altercation as a result of his mother having to step in and stop his father from whipping his sister . . . excessively with a belt." He reported that this happened when the sister was about three years old. The August 24 note, which followed a session with the parties and MC1, indicated that appellant kept trying to focus on the parties getting back together instead of on MC1. On August 29, according to the clinic note, discipline was discussed, and it was noted that MC1 did not respond well to previous attempts of punishment and discipline. Appellant indicated that the children had formed cliques and that they would count the "licks" he gives them, some claiming as many as twenty, and spread it around the home, resulting in him being portrayed as harsh. However, he denied hitting them that many times. Appellant also inquired

about the DHS report, stating that "he came [there] for help not to get in trouble." Appellant also spoke about a vision he was shown of his and appellee's wrongdoings and the things that needed to be done to repair the relationship. It was noted that appellant continues to have "a disconnect in regards to the current status of the divorce proceedings." The September 4 clinic note indicated that it was difficult for appellant and MC1 because listening to each other presented a challenge. It was noted that MC1 kept interrupting appellant to insert his version of a memory and that appellant kept recalling biblical stories unrelated to the questions. The clinic note dated September 18 reported that appellant had yelled at MC1 in the bathroom before therapy. When asked about it, appellant indicated that he has difficulty hearing, and that is why his voice comes out as being loud or yelling.

In a contact note dated September 20, Casados indicated that appellant had called the clinic approximately fourteen times and left two voicemails before the clinic opened. He also sent two faxes requesting that information and a text message be sent to appellee. Boaz stated that he had to have a discussion with appellant and ask him not to call so much. He said that he later had to tell appellant not to show up at the clinic as much as he was. He testified that appellant would show up even on days the children were not scheduled for therapy. It was noted in the September 28 note where the parties were present with MC1 that appellant took time dedicated to discussing behavior plans for MC1 to talk about the parties getting back together and "ended up chasing [appellee] out of the office when she left early." On October 5, MC1 reported that appellant interrogated him about the DHS interview, and that when yelling was reported coming from the bathroom at a prior session, that was what was going on. The October 11 clinic note indicated that MC1 stated that it was difficult to be around appellant due to the

10

constant yelling but that he is happy being with appellee. MC1 also indicated that he would like to spend more time on his cell phone, but appellant takes his phone to text appellee. On October 16, MC1 reported that he and his sisters had been in a department store with appellant, and the security officer had to be called to intervene because appellant "became emotionally and verbally out of control." MC1 also reported that a restaurant manager called the police on appellant for leaving them unattended for a prolonged period. According to the October 23 clinic note, MC1 was "interrogated" by appellant for several hours following the last therapy session. The note also stated that appellant took MC1's phone and copied and erased all the recordings MC1 reported that he was making. The November 2 clinic note stated that MC1 was happy about the parties' pending divorce and said he enjoys the different benefits of living separately from appellant. A clinic note dated November 27 stated that MC1 indicated they had received a picture of gifts from appellant's side of the family from an unknown number, which stressed MC1 out. Boaz said that Casados entered a contact note on December 10, 2018, indicating that appellant showed up and left an eighteen-page letter after she had left for the day, outlining "talking points" for conversation with a lawyer, which was unusual because they usually get information related to treatment. MC1 was released from the program around August 5, 2019, with the same diagnosis.

Boaz then discussed MC2. He stated that MC2 suffered from hyperactivity and attentive symptoms for which she had to be placed on medication due to scoring eighteen out of eighteen on the scale. MC2 was noted to be much more engaged on August 21, 2018, and was interested in using drawings to express her feelings. She indicated that she felt nervous, sad, and scared when they lived with appellant. She also stated that she, appellee, and her siblings would "escape

11

the house to go on walks around the neighborhood until [appellant] would calm down." On October 16, MC2 indicated that appellant directed her not to speak about her emotions in therapy. In the November 27 clinic note, MC2 indicated that she had been feeling very sad and upset because she missed appellant. She stated that she and her siblings would hide when appellant was angry to avoid negative interactions with him. In the August 20, 2019, clinic note, it was noted that MC2 was disappointed by appellant's decision to not exercise visitation for nearly a year. She said that she had originally felt angry and sad. MC2 was released from care on September 12, 2019, scoring zeros on the scale with her medication.

According to Boaz, MC3 was diagnosed with disruptive behavior disorder. A group session took place on September 12 with appellant and the children. The children reported that appellant would place them in "time-out" for hours, whereas appellant stated that it did not last that long. Clarification was given to appellant about the appropriate length of time for time-outs based on the children's ages. MC3's records included the same September 20 record as was found in MC1's record concerning the excessive calls by appellant as well as the faxes. Again, Boaz opined that the faxes appellant asked them to pass on to appellee were inappropriate. Appellant's inability to successfully redirect MC2 and MC3 was noted in the October 11 clinic note. In was noted in the October 23 note that MC3 still had problems with wetting the bed and having accidents while at school and church. According to the December 11 note, MC3 indicated that she was sad since appellant's visitation had been suspended. She stated that she would rock if she had to use the bathroom or if she was feeling stressed or anxious due to overwhelming situations such as the "volume of her siblings and her former home life experience when volume and tension was present." She said that she was able to stop rocking since things

had quieted down. The April 4, 2019, clinic note stated that MC3 blamed the devil for her parents' getting a divorce. She stated that appellant had taught her this and that she was not supposed to let appellee hear her say it. She also expressed worry about appellee because of the "devil's work." MC3 was discharged from therapy on May 15, 2019.

Appellee testified that she and appellant were married on September 13, 2006, and that three children were born of the marriage. She said that they separated on August 10, 2018, which is the same day she filed a petition for divorce and an ex parte petition for custody. She stated that she was a resident of Pulaski County and had been since 2009. She testified that she filed her petition because she

> held as many as four part time jobs at a time and [she] always held at least two. [She had] wanted to leave because [appellant] was a terrible husband but [she] thought he was an okay father and [she] thought [she] was doing what was best for the children by sticking around[.] But whenever [she] wen[t] to the VA, [she] was no longer eligible for overtime and [her] hours had changed and [she] was coming home early, and [she] cold hear the screaming and the crying and things from the street. And [she] would come in and [she] would try to find out what was going on, what was wrong, and [her] kids were avoiding [her]. They wouldn't talk to [her].

She stated that she subsequently put the children in therapy "under the guise of behavioral therapy which was completely warranted in this case." She said that she put them in therapy to try and get them some help. She testified that it came out in therapy that what was going on in the home was adversely affecting the children, and that is when she decided to leave appellant and file for divorce. She stated that appellant's screaming and ranting would last for hours and that for the last several years of the marriage, appellant would not let her see her family. She said that she kept a bag packed in the car, and when the opportunity presented itself, usually early hours of the morning, she and the kids would leave and go visit her family.

13

She stated that even doing this, she still did not see her family but a few times a year. She testified that when they returned, there would be "just hours of just screaming and ranting." She stated that one time after coming from seeing her family, appellant made her lick the dirt off the tires because he had just washed the car before she left, and her family lives down a dirt road. She said that appellant would do "demeaning, humiliating things like that." She stated that she decided to not go visit her family after she was asked by one of her children why they had to sneak. She said that she reached a breaking point in August 2018 when she learned what the children were going through.

Appellee testified that appellant berated her night and day with text messages to the point it was hard for her to work or sleep. She said that she learned of the Dillard's incident and that she was unaware that appellant had left the children in IHOP unattended while he talked on the phone with her for three hours on October 13. She stated that she talked to him that long because he had been sad the day before; however, when she found out that the children were alone in the restaurant, she told him to go back inside with them and hung up. She said that when she dropped the children off to appellant at Tropical Smoothie on October 12, he was sobbing and incoherent. He told her that he was suicidal. She said that she was worried about her children and did not want them with him while he was in that frame of mind. She stated that the children were in Tropical Smoothie for about thirty minutes alone while appellant talked to her outside. She said that she eventually went inside with him and ordered for the children. She stated that he followed her outside, and she called his mother and informed her of the situation. She testified that the children are anxious before they visit with appellant: MC2

14

would be all over the place, MC3 would rock, and MC1 would be mad and mean. However, she stated that MC3's rocking behavior had ceased.

Appellee testified that appellant sent her twenty-two text messages within a period of twelve hours between October 5 and 6. She said that the messages were sometimes sexual in nature and that she was "always completely bombarded." She stated that the contents of the text messages were examples of the "verbal abuse [she] had to endure while [she] was married and because [appellant] would just never quit talking and never quit texting and this is indicative of what [they] all had to experience." She said that appellant would call the children but would really want to speak to her or have them relay messages to her for him. She testified that appellant's communications never ceased and that it was too much; appellant would constantly call and text, and she could not work to take care of her family and read and respond to all his messages. She said that when her phone went off like that, she would feel frustrated and hopeless. She stated that she wondered if it was ever going to end and if she was ever going to have some kind of peace. She said that it got so bad that she had to keep her phone on silent while she was at work. She stated that one day she missed an emergency phone call from the school because her phone was on silent. She said that appellant continued to send a barrage of messages even though there was a no-contact order in place and that he did not stop until he was threatened with jail. She begged the circuit court to keep the no-contact order in place. She stated that in her mind, it was never about the children; appellant just used them to get to her. She testified that she now lives on the Jacksonville Air Force Base and that she moved there because it is gated, and she does not have to worry about appellant "doing drive-bys or drop-ins or being able to harass [her] in person."

She stated that she filed her third ex parte petition after the December 10 hearing because appellant violated the five-hundred-feet restriction twice on December 11: once outside the clinic where the children attend therapy and then at church. She said that appellant has subsequently been banned from church, but she will not go back because she has "so much anxiety associated with it." She stated that she would prefer that appellant not be allowed to have visitation with the children, but if visitation is granted, she would like for it to be supervised and for appellant to be required to complete therapy. She also stated that she wants appellant evaluated by a psychiatrist because she believes "in [her] heart that he has a mental illness." She stated that appellant never completed the therapy agreed upon in the August 2018 agreed order, and she has not received any child support from appellant during this case. She said that he is unemployed, but he has a medical degree, and at one point, he was licensed to practice medicine. However, he had not practiced medicine in many years. She said that appellant does have a medical decree and an associate and bachelor's degree. She stated that appellant's unemployment is by choice, and he once told her that if he could not practice medicine, he would not do anything at all. She opined that appellant has the ability to make "a hundred thousand dollars a year if he wanted to." She asked the circuit court to impute income at minimum wage for appellant for purposes of child support. She testified that she has been the sole provider for the children since 2010 because appellant has not worked since that time. She said that prior to 2010, appellant worked at a Nissan dealership and a Kia dealership. She stated that before then, he was in a residency program in Iowa and that he had been licensed to practice medicine in both Iowa and Tennessee. She wanted child support to be awarded retroactively.

Appellee testified that the children had not seen appellant since the fall of 2018 and that they were doing well. She stated that MC1 no longer needs medicine, MC2 is doing better but is still on medications, and MC3 is also better and no longer rocks but still has issues with bed wetting. She said that she has not had direct contact with appellant since the orders were put in place, but once when she was at his parent's house, he had someone from McCain Mall call her for him. She stated that she did not speak to the person but instead passed the phone to appellant's mother. She said that he also taunted the children by sending them a picture of toys that he never gave to them. She asked the circuit court to order retroactive child support, to find appellant in contempt for violating the court's orders, and to award her attorney's fees. She asked for reimbursement of her witness fees and costs and to be restored to her maiden name.

The court recessed following appellee's direct testimony. Appellant's counsel indicated to the circuit court that he had just received some emails from appellant containing notes for his COVID-19 diagnosis. The circuit court stated that in the best interest of judicial economy, since they were close to finishing up appellee's case, they would proceed. No party objected to the circuit court's decision.

On cross-examination by appellant's counsel, appellee testified that she wanted the circuit court to award her the marital trailer even though she does not plan to live in it. She stated that appellant has never proved his alleged health problems. She said that appellant told her that he got ear infections and that his neck hurts. She admitted that he was in an accident and complained of neck pain. She testified that appellant has "a lot of accidents and then he uses the money for the settlements to live on." She stated that she believes appellant has mental-health issues. She said that she has about $18,000 in her retirement account and wants to be

able to keep all of it. She testified that although appellant has not paid support, he bought the children shoes; however, she stated that they did not need shoes because she provides them with shoes. She admitted that the issue of child support was mentioned in the last court hearing but that she did not remember it being a part of the order.

On cross-examination by the attorney ad litem, appellee testified that MC1 took most of appellant's abuse. She stated that when appellant made her lick the dirt off the car's tires, the children were inside the house, but she saw at least one head peeking through the door. She said that she once received $500 from appellant in the fall of 2018. She stated that the shoes were approximately six months ago but that it "never came to fruition." She testified that she is afraid that the children will regress if appellant is awarded unsupervised visitation. She stated that the children are doing well and that she does not want to "rock the boat." She said that she cannot trust appellant to take care of the children's financial, emotional, or physical needs. She stated that the children now know what a normal life looks like and that she does not want appellant to hamper their progress. She testified that she does not see how it benefits anybody by placing the children back into the crazy chaos that they left.

On redirect, appellee stated that the last accident appellant got into was in 2016. She said that when she left appellant, he was telling her that his neck was hurting but he was not contemplating surgery. She stated that he subsequently underwent surgery and asked her if she would come and take care of him. She opined that the surgery was an attempt to get her back home. She stated that appellant has a medical degree and can work in billing and coding. She said that she works in the medical field and has no medical background. She said that appellant did not give her the shoes or the gifts he purchased for the children.

Patti McIlroy, appellee's mother, testified that appellee has lived in Pulaski County since 2009. She stated that she is familiar with the state of the parties' marriage and that there were problems within it. She said that at one time, appellee was working four jobs to provide for her children and would still have to cook and help the children with homework when she came home at night. She stated that this was "frustrating" for appellee. She testified that appellant "had a volatile temper, and if you didn't agree with him, then you were verbally attacked, and it was just mainly over I would say finances and the children." She opined that the way appellant behaved made appellee's life intolerable. She stated that it was more appellant's fault than appellee's fault because he was not working, which frustrated appellee and that he did not try to help her raise the children. McIlroy stated that appellant slept all day and that the children "kind of took care of themselves" which also frustrated appellee.

Once appellee rested her case, the circuit court asked appellant's attorney about his contact with appellant. The attorney stated that appellant sent several emails but that he did not have time to look at all of them because court was reconvening. However, he indicated that there did seem to be doctor's notes attached. The email was forwarded to the circuit court and other attorneys, and the circuit court found that it was satisfied with the documentation showing that appellant was positive for COVID-19. It stated that it would reserve one hour on February 2 so that appellant could testify. Appellant's counsel stated that the date and time announced by the circuit court was available on his calendar. The circuit court stated that it would leave the record open and give appellant the opportunity to testify. Without objection from either party, the circuit stated that it would like to go ahead and issue an order subject to modification

19

based on appellant's testimony. After the circuit court's verbal announcement, appellant's counsel was concerned only about the decision to order retroactive child support.

Appellant filed a motion for continuance on January 25, 2021, contending that he was still ill from COVID-19 and that he had a doctor's note saying that he should not return to the court hearing until February 15. The final hearing was subsequently moved to March 2. At the onset of the hearing, the issue about allowing appellant to present a witness was brought up, and the circuit court agreed with appellee that it had excluded any witnesses by appellant except for appellant himself. Appellant's counsel stated that the witness had moved to Georgia, and they were having problems tracking her down, and that is why they did not have a phone number or address for her.

Appellant testified that he does have a "doctor of medicine" but that he cannot use it due to Medicare-funding issues. He stated that he has physical limitations that would prevent him from going back into residency. He said that he needs one more surgery, and he now suffers from swelling in his hand. He also said that he has a lot of neck pain and that he cannot sleep. He said that the nerve compression he has is so bad that he is completely drained when he does activities. He opined that he could not work in fast food or do any other job until after his surgery because repetitive motions cause bad pain. He further testified that he has a deteriorated spine, severe arthritis, and has had multiple back injuries. He testified that his neck and back injuries resulted from his being rear-ended in 2013 by a truck traveling one hundred miles an hour. Appellant stated that he had not seen his children in over two years because appellee prevented him from seeing them by making up "a bunch of things." He said that he has an excellent relationship with his children; that they have never feared him; and that they love him.

He denied being guilty of any of the things he was accused of. He claimed appellee would "rage at [him] from the time [they] got up to the time [they] went to bed day after day." He said that he would ask her to "[p]lease stop" and that he never started one fight with appellee. He also said that he loves appellee with "all [his] heart." Again, he stated that none of the allegations against him are true. He said that he completed his discovery as best as he could and that his attorney helped him with it. He said that he believed that appellee's counsel "broke the law and she gave [him] 21 interrogatories. [He] think[s] she scrambled them up. [He] think[s] she is up to 66 and [he] only got 45."

The circuit court issued it ruling following appellant's testimony, granting appellee a complete divorce. The attorney ad litem filed her report on March 2 recommending that appellee should be given sole physical and legal custody of the children and that appellant undergo a psychological evaluation before he starts any therapy with the children. She also noted that MC1 wanted no contact with appellant, but MC2 and MC3 did; however, she opined that it was not in their best interest. The divorce decree was entered on March 17, 2021; it granted appellee an absolute divorce from appellant based on general indignities; gave her sole legal and physical custody of the children; awarded appellee child support in the amount of $407 a month based on imputed income to appellant; and ordered retroactive child support in the amount of $12,210 to be paid at the rate of $100 a month. Appellant was granted supervised visitation contingent upon his completion of a complete psychological evaluation and

compliance with all treatments and recommendations for at least ninety days before supervised visitation begins.[2]

Appellant filed a motion for new trial on March 25, contending that a new trial was needed under Rule 59(a)(1) and (6) of the Arkansas Rules of Civil Procedure in that certain irregularities occurred in the proceedings, and an abuse of discretion prevented appellant from having a fair trial resulting in a miscarriage of justice. He also argued that it was erroneous for the circuit court to deny his motion to dismiss on the basis that appellee failed to sufficiently prove her grounds for divorce. Appellee filed a response on April 8 denying the material allegations of appellant's motion and asking the circuit court to deny appellant's motion.

Appellee filed a motion for attorney's fees on March 31 seeking fees in the amount of $37,314.01. Appellant filed a response on April 6 and he denied the material allegations of the motion. He contended that it would be inequitable and unjust for the circuit court to award such a large fee without providing any support for the requested amount. Additionally, he asked that he be granted his costs and reasonable attorney's fees because appellee's counsel cast him in a false light to give the circuit court a negative impression of him. Appellee filed a reply on April 8 denying the material allegations of appellant's response. The circuit court denied appellant's motion for new trial in an order filed on April 19. Following a hearing, the circuit court entered an order on April 26 awarding appellee attorney's fees and costs in the amount of $41,467.96.

---

[2]The circuit court also made certain property divisions that are not relevant to this appeal.

Appellant filed a timely notice of appeal on May 19. Several extensions were granted by the circuit court, and the supreme court issued an order of certiorari in January 2022 so that the record on appeal could be completed. This appeal followed.

As his first point on appeal, appellant contends that we should reverse and remand the divorce decree because the circuit court made numerous errors. Appellant argues that the circuit court erred by denying his motion for continuance. He contends that since he was suffering from COVID-19 on the date of the divorce hearing, the circuit court should have granted his motion. He relies on the supreme court's per curiam, *In Re Response to the COVID-19 Pandemic*,[3] to support his contention that he had good cause to request the continuance and that the circuit court abused its discretion when it denied his request on the first day of the hearing.

When the circuit court announced its decision to continue with appellee's case-in-chief for the sake of judicial economy, no party objected. Appellant's counsel was present and voiced no concerns about the circuit court's decision to continue with the testimony in appellant's presence. In fact, his direct response was "[y]es, your honor." Counsel acquiesced to the court's action. We thus reject appellant's argument under the invited-error doctrine. It is well settled that under the doctrine of invited error, appellant may not complain on appeal of an erroneous action of the circuit court if he had induced or acquiesced to the action.[4] Additionally, appellant

---

[3]2020 Ark. 384 (per curiam).

[4]*See Mo. Pac. R.R. Co. v. Gilbert*, 206 Ark. 683, 178 S.W.2d 73 (1944).

ultimately received what he asked for—a continuance to present his case. Thus, one cannot complain on appeal where one received all the relief asked for.[5]

Appellant contends that the circuit court prejudiced the case by entering its opinion before he presented his case-in-chief. He argues that his due process was violated because the circuit court ruled without hearing his side of the story. This argument is without merit. The circuit court announced that it would go ahead and make a ruling, subject to modification based on appellant's testimony when the hearing resumed later.[6] Appellant's counsel failed to object to the circuit court's decision to go forward and issue a preliminary ruling. Counsel's only concern was with retroactive child support. Counsel's actions can be construed as acquiescence. We thus reject appellant's argument under the invited-error doctrine.[7]

Appellant argues that the circuit court erred in striking appellant's ability to present witnesses or evidence. Specifically, he contends that other sanctions were available that were less harsh than the relief appellee sought. It must be noted that appellant's argument focuses on the wrong rule, as sanctions were imposed pursuant to Rule 37(b)(2) of the Arkansas Rules of Civil Procedure. Rule 37(b)(2) authorizes the circuit court to impose sanctions if a party fails to obey an order to provide discovery and gives the court broad discretion to make such orders in regard to the failure as are just, including refusing to allow the party to "support or oppose

---

[5]*Mikel v. Hubbard*, 317 Ark. 125, 876 S.W.2d 558 (1994).

[6]The circuit court had originally set February 2 as the date to hear appellant's testimony, but it was continued to March 2.

[7]*Mo. Pac. R.R. Co.*, *supra*.

designated claims or defenses, or prohibit him from introducing designated matters into evidence."[8] We review the imposition of discovery sanctions for abuse of discretion, and the bar to demonstrate that the circuit court has abused its discretion in an order under Rule 37 is very high.[9] A circuit court abuses its discretion when it acts thoughtlessly, improvidently, or without due consideration.[10]

Here, the circuit court had to issue two orders to compel compliance with discovery, and appellant still did not abide by the circuit court's orders. He supplemented the discovery one to two months after each order's deadline, and he still did not fully comply. Appellant was warned in the second order to compel that his exhibits and witnesses may be struck if he failed to obey the circuit court's orders. He still failed to obey the orders and complete discovery. Even though there were less harsh sanctions available, the circuit court was not just limited to those sanctions. Appellant attempts to argue that the circuit court abused its discretion because it gave appellee the relief she sought; however, we disagree. Due to the nature of this case and appellant's outright refusal to comply with discovery and the court's orders to compel, we cannot say that there was an abuse of discretion on the part of the circuit court.

Appellant contends that the circuit court erred by ordering retroactive child support without a previous order to pay. Our standard of review for an appeal from a child-support order is de novo on the record, and we will not reverse a finding of fact by the circuit court

---

[8]Ark. R. Civ. P. 37(b)(2).

[9]*Phelan v. Discover Bank*, 361 Ark. 138, 205 S.W.3d 145 (2005).

[10]*Hardesty v. Baptist Health*, 2013 Ark. App. 731, 431 S.W.3d 327.

unless it is clearly erroneous.[11] In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony, and we will not reverse the circuit court absent an abuse of discretion.[12]

The parties separated on August 10, 2018, and appellee filed for divorce that same day. In the complaint, she sought emergency custody of the children and "proper orders regarding child support." The issue of child support came up in several hearings, but there never was an order issued. Appellee testified that appellant had not given her anything by way of support for the children since their separation except $500 in the fall of 2018. The circuit court awarded appellee retroactive child support from the date she filed her complaint for divorce, August 10, 2018, since appellant had done very little by way of supporting the children.[13] Additionally, it makes no difference if appellant had never been ordered to pay child support. It is well settled that a parent has a legal obligation to support his minor children.[14] This moral and legal duty remains regardless of the existence of a support order.[15]

Appellant argues that the circuit court erred by imputing income in view of his inability to work. He states that his undisputed testimony shows that he is unable to earn wages and that

---

[11]*Ward v. Doss*, 361 Ark. 153, 205 S.W.3d 767 (2005).

[12]*Id.*

[13]*See generally Grynwald v. Grynwald*, 2022 Ark. App. 210, 651 S.W.3d 177.

[14]*Pender v. McKee*, 266 Ark. 18, 582 S.W.2d 929 (1979).

[15]*In re Adoption of A.M.P.*, 2021 Ark. 125, 623 S.W.3d 571.

the circuit court abused its discretion. As a rule, we will not reverse a circuit court's decision regarding the amount of child support absent an abuse of discretion.[16] The child-support scheme in Arkansas at the time of the parties' divorce was governed by Arkansas Supreme Court Administrative Order No. 10, which is based on an income-shares model adopted by the supreme court in *In re Implementation of Revised Administrative Order No. 10*,[17] which became effective on June 30, 2020. Section III, paragraph 8 addresses "Income Imputation Considerations" and provides in pertinent part:

> If imputation of income is ordered, the court must take into consideration the specific circumstances of both parents, to the extent known, including such factors as the parents' assets, residence, employment and earnings history, job skills, educational attainment, literacy, age, health, criminal record and other employment barriers, and record of seeking work, as well as the local job market, the availability of employers willing to hire the parent, prevailing earnings level in the local community, and other relevant background factors in the case.

> There is a rebuttable presumption that the payor and the payee can work full-time or earn full-time income, and the court may calculate child support based on a determination of potential income that would otherwise ordinarily be available to the parties.

> The court may consider a disability or the presence of young children or disabled children who must be cared for by the parent as being a reason why a parent is unable to work.[18]

Without citation to authority, appellant contends that the court was required to believe his testimony but that appellee should have been required to present medical evidence to support

[16]*Perry v. Perry*, 2020 Ark. App. 63, 594 S.W.3d 126.

[17]2020 Ark. 131 (per curiam).

[18]*See* Ark. Sup. Ct. Admin. Order No. 10(III)(8).

her contention that appellant was able to work. We defer to the circuit court on issues of witness credibility.[19]

Here, the circuit court heard conflicting testimony concerning appellant's ability to work and earn at least minimum wage. The circuit court credited appellee's testimony over appellant's on the issue. Appellant was unable to rebut the presumption that he can work a full-time job, and although he claims to suffer from spine, neck, and back issues, the circuit court was not required to believe his testimony. The circuit court specifically found that appellant can obtain some form of employment, including medical-document review, but has chosen not to work. We cannot say that this was an abuse of discretion.

Appellant argues that the circuit court erred by denying his request for joint custody of the children. Child-custody matters are reviewed de novo on appeal, but the circuit court's findings are not reversed unless they are clearly erroneous.[20] Whether a circuit court's findings are clearly erroneous turns in large part on the credibility of the witnesses, and special deference is given to the circuit court's superior position to evaluate the witnesses, their testimony, and the child's best interest.[21] There are no cases in which the circuit court's superior position, ability, and opportunity to observe the parties carry as great a weight as those involving minor children.[22] The primary consideration in child-custody cases is the welfare and best interest of the child,

---

[19]*Minton v. Minton*, 2010 Ark. App. 310, 374 S.W. 3d 818.

[20]*Janjam v. Rajeshwari*, 2020 Ark. App. 448, 611 S.W.3d 202.

[21]*Id.*

[22]*Id.*

with all other considerations being secondary.[23] Although our legislature has amended Arkansas Code Annotated section 9-13-101[24] to state that an award of joint custody is favored in Arkansas, joint custody is not mandatory.[25] The statutory preference for joint custody does not override the ultimate guiding principle that the best interest of the child is the polestar for a custody determination.[26]

Appellant does little to develop his argument on this issue and fails to cite evidence in the record that he claims demonstrates why joint custody should have been granted in this case. For the most part, appellant presents us with a lot of case law but fails to show us how it applies to the case at hand. Additionally, he points us to his testimony but fails to argue how that supports an award of joint custody. The failure to develop a point legally or factually is reason enough to affirm the circuit court's order.[27] Because appellant has failed to present this court with convincing and developed arguments, we affirm the circuit court's decision to award appellee sole legal and physical custody of the parties' children.

Appellant contends that the circuit court erred by requiring supervised visitation. He makes conclusory statements, fails to direct us to specific evidence in the record, fails to appropriately cite authority, and otherwise fails to completely develop his argument. The

---

[23]*Id.*

[24](Supp. 2023).

[25]*Janjam, supra.*

[26]*Id.*

[27]*Walters v. Dobbins*, 2010 Ark. 260, 370 S.W.3d 209.

supreme court has repeatedly held that it will not consider an argument if the appellant does not make a convincing argument or cite authority to support it.[28] It is not the duty of this court to research or develop arguments for an appellant on appeal.[29] The failure to develop a point legally or factually is reason enough to affirm the circuit court.[30] Because appellant has failed to present this court with convincing and developed arguments, we affirm the circuit court's order requiring supervised visitation.

Finally, under appellant's first point on appeal, he argues that the circuit court erred in its award of attorney's fees without allowing appellant to examine and question the time records. Although neither party raises the issue, the circuit court's order presents a jurisdictional question that this court considers sua sponte.[31] An appeal may be taken from a final judgment or decree entered by the circuit court.[32] For an order to be final and appealable, it must terminate the action, end the litigation, and conclude the parties' rights to the matter in controversy.[33] Under Arkansas Rule of Civil Procedure 54(b), an order that adjudicates fewer than all claims, including counterclaims, is not final for purposes of appeal.[34]

---

[28]*Koch v. Adams*, 2010 Ark. 131, 361 S.W.3d 817.

[29]*Smith v. Heather Manor Care Ctr., Inc.*, 2012 Ark. App. 584, 424 S.W.3d 368.

[30]*Walters, supra.*

[31]*Hankook Tire Co., Ltd. v. Philpot*, 2016 Ark. App. 386, 499 S.W.3d 250.

[32]Ark. R. App. P.–Civ. 2(a)(1) (2022).

[33]*Beverly Enters.-Ark., Inc. v. Hillier*, 341 Ark. 1, 14 S.W.3d 487 (2000).

[34]*Lamont v. Healthcare Cap., Inc.*, 2013 Ark. App. 283.

In this case, appellant sought attorney's fees, even though he acknowledged that he was not the prevailing party. The circuit court failed to dispose of appellant's counterclaim in the order granting appellee's request for fees; thus, the counterclaim is still pending. We therefore dismiss this portion of appellant's appeal without prejudice.

For the reasons stated above, we affirm in part and dismiss without prejudice in part appellant's first point on appeal.

As his second point on appeal, appellant contends that the circuit court erred by denying his motion for a new trial. He states that a new trial should have been granted to him under Ark. R. Civ. P. 59(a)(1) and (3). Rule 59(a)(1) provides that a new trial may be granted if there is any irregularity in the proceedings or any order of the court or abuse of discretion by which a party was prevented from having a fair trial. Rule 59(a)(3) states that a new trial can also be granted on the ground of accident or surprise that ordinary prudence could not have prevented. We note at the outset that appellant did not list Rule 59(a)(3) in his motion for new trial, so any argument on this ground is not properly before us. His argument on appeal focuses on the circuit court's decision to proceed with the hearing after appellant's counsel informed it that appellant was ill. There is no real development to the argument, and since we have already addressed the same or similar issue above, we affirm. To the extent that appellant complains of being granted only one hour to testify, we dispose of that argument under the invited-error doctrine. Appellant's counsel was present when the circuit court announced that it would set aside an hour at a later date for appellant to give his testimony and failed to object or voice any concerns about the amount of time given. It is well settled that under the doctrine of invited

error, appellant may not complain on appeal of an erroneous action of the circuit court if he had induced or acquiesced to the action.[35]

Appellant's other argument concerning the circuit court's denial of his motion for new trail states that the court erred in denying his motion to dismiss. However, it should be noted that a review of the record shows no such motion, neither does appellant point us to the motion to dismiss in his argument. However, the lack of the motion is not fatal since our law is long settled that in a nonjury trial, a party who does not challenge the sufficiency of the evidence does not waive the right to do so on appeal.[36] Appellant's argument is as follows:

> The motion for new trial further noted error in failing to grant Dr. Gadberry's motion to dismiss that challenged grounds for divorce. They were not waived. Testimony of a volatile temper, and that appellee worked four jobs was not enough under settled law. *Maryland v. Maryland*, 2019 Ark. App. 390, at *5, 586 S.W.3d 179, 182 (controlling behavior), and *Fincher v. Fincher*, 2011 Ark. App. 563, at *4, 2011 Ark. App. LEXIS 613 (verbal abuse insufficient corroboration).

Just as above, appellant has failed to develop his argument, limiting it to three sentences accompanied by citations. Therefore, we affirm the circuit court's denial of appellant's motion for new trial.[37]

Affirmed in part; dismissed without prejudice in part.

HARRISON, C.J., and KLAPPENBACH, J., agree.

*Robert S. Tschiemer*, for appellant.

*The Law Offices of Katherine E. Blackmon*, by: *Jalen Toms*, for appellee.

---

[35]*Mo. Pac. R.R. Co.*, *supra*.

[36]*Mayland v. Mayland*, 2019 Ark. App. 390, 586 S.W.3d 179.

[37]*Walters*, *supra*.